UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCESCA M. AIELLO AND MEGAN A. JOHNSTON, <br><br>Plaintiffs, <br><br>v. <br><br>RENT RECOVERY SOLUTIONS, LLC, <br><br>Defendant. | Lead Case No.  1:23-cv-01542-KES-EPG <br><br>Member Case No.  1:23-cv-01544-KES-EPG <br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT <br><br>Doc. 36 |

This matter is before the Court on the motion for summary judgment filed by defendant Rent Recovery Solutions, LLC, ("Rent Recovery") on March 20, 2025.  Doc. 36.  Plaintiffs Francesca M. Aiello and Megan A. Johnston filed an opposition to the motion on May 16, 2025.  Doc. 43.  Rent Recovery filed a reply on June 23, 2025.  Doc. 47.  For the reasons explained below, Rent Recovery's motion for summary judgment is denied.

**I.    BACKGROUND**

   **A.    Factual Background[1]**

Aiello and Johnston signed a residential lease agreement for an apartment at "The Emerson" located in Clovis, California.  JXUF ¶ 1; Doc. 37-4 at 9.  The term of the lease was

---

[1] The relevant facts that follow are undisputed unless otherwise noted and are derived from the joint statement of undisputed facts submitted by defendant, Doc. 37 ("JXUF"); the statement of additional material facts submitted by plaintiffs, Doc. 44 ("PAMF"); as well as the discovery materials attached to the pending motion and opposition.  Docs. 38-1, 38-2; 43-1, 43-2.

1  thirteen months, beginning on September 8, 2020, and ending on October 7, 2021. JXUF ¶ 2.

2  Monthly rent for the lease was $1,660.00, "due in advance on or before the first day of each and

3  every month." JXUF ¶ 3. An addendum to the lease provided Aiello and Johnston a prorated

4  rent credit of $127.00, reducing their monthly rent obligation to $1,533.00. JXUF ¶ 11. The

5  addendum contains the following provisions:

> Should you vacate prior to the end of this Lease Agreement, you will be held responsible for repayment of the full amount of the rent credit, which Lessor shall be entitled to debt from Lessee's security deposit and bill Lessee for any deficiency.
>
> [. . .]
>
> Should you vacate prior to the expiration of this Lease Agreement you will be responsible for repayment of the full amount of the rent credit given, which Lessor shall be entitled to deduct from Lessee's security deposit and bill Lessee for any deficiency.

12  Doc. 37-4 at 28 (emphasis omitted); JXUF ¶ 12. Aiello and Johnston were also responsible for a

13  $75.00 monthly parking fee and the cost of utilities (marked water, sewer, trash) as set forth in the

14  lease agreement. JXUF ¶¶ 5–7, 13.

15      The lease agreement includes the following notice to vacate and lease termination option

16  provisions:

> **Notice to Vacate:** If at the end of the lease term Resident does not intend to renew the Lease Agreement or agree to a month to month occupancy Owner/Agent requires a written notice thirty (30) days prior to the date you intend to vacate. If you must vacate prior to lease expiration, please contact your Community Manager for details regarding details of the Lease Termination Option. Rent will continue until all keys are returned to the Leasing Center.
>
> **Lease Termination Option:** Provided Resident is not in default under this Lease Agreement, Resident shall have the option to terminate his/her Lease Agreement prior to the expiration date on the following terms and conditions:
>
> i.  Resident shall give Owner/Agent not less than 30 days written notice, by form prescribed by and available from Owner/Agent, of the Resident's intent to terminate. Once given the notice cannot be revoked, except with the Community Manager's written consent.
>
> ii. In order to exercise the Lease Termination Option, the Resident must pay the termination fee at the time the Notice of Intent to Vacate is submitted, or within 48 hours thereafter. If the Resident has resided at the community for less than one (1) year the fee will

    be equal to two (2) times the current monthly rent under the Lease Agreement. If the resident has resided at the community for more than one (1) year the fee to be paid will be equal to one (1) times the current monthly rent under the Lease Agreement.

   iii. Resident must continue to pay rent when due and all other conditions under the Lease Agreement remain in effect.

   iv. Resident will be responsible for repayment of all lease concessions received during the initial lease term.

   v. If the Resident does not follow the procedures exactly as set forth in sections 27.i. through iv. above, the Resident will be charged a Lease Termination Fee equal to two (2) times the monthly rent under the Lease Agreement. Any unpaid balances after move out may be sent to collections and a negative credit report may be submitted to a credit reporting agency.

JXUF ¶¶ 9, 10.

  In their depositions, Aiello and Johnston testified that they met with a representative of The Emerson named Kimberly on July 29, 2021, to discuss the circumstances of their upcoming move out. Docs. 37-1 at 17–18; 37-7 at 17–18. Aiello and Johnston needed to relocate due to their employment as traveling speech therapists. Docs. 37-1 at 36; 37-5 at 15. According to their testimony, the two informed Kimberly that they would be vacating the apartment early and not terminating the lease. Docs. 37-1 at 12–13; 37-8 at 10–11. As of August 1, 2021, Aiello and Johnston had a credit of at least $3,216.00 due to prior rent payments. PXUF ¶ 20. They contend that the $3,216.00 credit was the exact amount of the remaining rent owed, inclusive of parking. PAMF ¶ 2. Aiello and Johnston testified that they had already paid the remainder of the lease before the meeting, and that Kimberly reviewed the rental portal on her computer and verbally confirmed that there was no money due for the remainder of the lease. Docs. 37-1 at 12–13; 37-8 at 10–11.

  At the meeting, Aiello and Johnston signed a form titled, "Thirty (30) Day Notice of Resident(s) Intent to Vacate." JXUF ¶ 14; Doc. 37-5 at 15. They testified that the form's move-out date was intentionally left blank at that time based on the discussion and understanding reached with Kimberly that the lease was not being terminated. Docs. 37-1 at 17–18; 37-7 at 17–18; 37-8 at 11. Aiello subsequently vacated the apartment between August 2, 2021, and August 9, 2021, and Johnston vacated the apartment on August 2, 2021. PXUF ¶¶ 16–17.

3

The apartment's move out statement, dated August 12, 2021, reflects a $3,325.35 balance owed due to various charges incurred between August 1, 2021, and August 10, 2021, including "Future Rent Lease Charges," a "Move-Out Concession Charge Back," and a lease termination fee. Doc. 37-17. In an email sent to the California Attorney General a little under two years later, Aiello and Johnston explained that in September 2021, they were contacted by The Emerson's real estate management company regarding the outstanding account balance and detailed their attempts to dispute the debt. Doc. 37-5 at 24–25. On January 31, 2023, the entity "Pay Ready" placed the debt described above with Rent Recovery for collection. Doc. 43-1 at 3; JXUF ¶ 19; PAMF ¶ 1.

Aiello testified that she received automated messages from Rent Recovery regarding the debt and that her credit score decreased in response to a "mark" from Rent Recovery. Docs. 37-1 at 12, 26; 37-2 at 2–3. Johnston similarly testified to receiving calls from Rent Recovery and that her credit score decreased in March 2023. Docs. 37-7 at 22, 23, 25. Rent Recovery sent debt collection letters to Aiello on February 1 and April 3, 2023, identifying itself as a debt collector. Doc. 37-5 at 20, 23. In discovery, it also identified the following communications with Aiello and Johnston that occurred while the debt was disputed: "Phone calls with Francesca Aiello on March 20, 2023, and May 5, 2023. Phone call with Megan Johns[t]on on April 4, 2023. March 30, 2023 letter from Aiello. Phone call with debtor on March 6, 2023." Doc. 43-1 at 5.

In March 2023, Aiello and Thomas Moore, a representative of The Emerson, exchanged emails concerning the debt. *Id.* at 18–19, 21. Moore explained to Aiello that

> everything charged on your ledger was correct, but I understand your frustration because you would have owed significantly less if you simply fulfilled your lease term through 10/07/2021 instead of giving possession of the apartment early. I can see how you and Megan thought you were doing the community a favor by vacating before the lease was over and I wish at the time it was communicated to you that it would have been in your best interest to just mail in the keys before the lease expired rather than turning them in early to prevent these additional charges. Again, I do sincerely apologize that I couldn't be of more assistance and wasn't here at the time to help you in a more beneficial way to prevent these extra charges, however, since nothing was done in violation of the lease agreement my hands are tied[. . . .] I know this was a very confusing situation and I do want to be as transparent as possible.

4

*Id.* at 18–19. Aiello and Johnston did not sign any other documents regarding the lease after the notice of intent to vacate. JXUF ¶ 15. The form's move-out date was subsequently entered as August 10, 2021, by someone other than Aiello and Johnston. Docs. 37-1 at 17–18; 37-5 at 15; 37-7 at 17–18.

The parties dispute whether the lease was terminated; whether the lease termination option applied automatically; whether the option was formally exercised; whether Kimberly assured Aiello and Johnston that they would not have to pay any sort of fees for vacating early; whether she verbally communicated that they had paid rent through the end of the lease; the amount, if any, owed on the lease; and ultimately, whether Rent Recovery's attempts to collect—given these disputes—were proper.

### B.     Procedural Background

On October 31, 2023, Aiello and Johnston filed distinct actions, each asserting in relevant part claims against Rent Recovery for violations of (1) the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. § 1692 *et. seq.*, (2) Regulation F pursuant to 12 C.F.R. 1006 *et seq.*, and (3) the Rosenthal Fair Debt Collection Practices Act ("RFDCPA") pursuant to Cal. Civ. Code § 1788 *et. seq.* Doc. 1; No. 1:23-cv-01544-KES-EPG, Doc. 1. The actions were consolidated on February 21, 2024. Doc. 19. Following an order granting the parties' stipulation of dismissal as to the co-defendant, Rent Recovery is the only remaining defendant in this action. Doc. 29.

## II.     LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Id.* at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party would not have the burden to prove the disputed claims at trial, then it must carry its initial burden of production at summary judgment in one two ways: "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Then, to carry its burden of persuasion on the motion, the moving party must "persuade the court that there is no genuine issue of material fact." *Id.*

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252. In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment. But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

Under the provisions of the FCDPA, debt collectors are prohibited "from making false or misleading representations and from engaging in various abusive and unfair practices."[2] *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010) (quoting *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995)). With a narrow exception not raised by the parties, the FDCPA "is a strict liability statute that 'makes debt collectors liable for violations that are not knowing or intentional.'" *Id.* (quoting *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008)).[3] The RFDCPA, "like its federal counterpart, is designed to protect consumers from unfair and abusive debt collection practices." *Barria v. Wells Fargo Bank, N.A.*, No. 2:15-CV-01413-KJM-AC, 2016 WL 474319, at *4 (E.D. Cal. Feb. 8, 2016). "Indeed, the provisions of the FDCPA are incorporated into the Rosenthal Act by California Civil Code section 1788.17. Consequently, conduct by a debt collector that violates the FDCPA violates the Rosenthal Act as well." *Id.* (citing *Riggs v. Prober & Raphael*, 681 F.3d 1097, 1100 (9th Cir. 2012)).

To establish a claim under the FDCPA, a plaintiff must show: "(1) that she is a consumer; (2) that the debt arises out of a transaction entered into for personal purposes; (3) that the defendant is a debt collector; and (4) that the defendant violated one of the provisions of the FDCPA." *Barria v. Wells Fargo Bank, N.A.*, No. 2:15-CV-01413-KJM-AC, 2016 WL 474319, at *4 (E.D. Cal. Feb. 8, 2016) (citation omitted). Rent Recovery does not take issue with the first two elements, instead, it argues that it is not a "debt collector" as defined in the FDCPA, and that there was no FDCPA violation because the debt it sought to collect was properly incurred

---

[2] The parties have not raised distinct arguments under Regulation F. That federal regulation was issued by the Bureau of Consumer Financial Protection to "carr[y] out the purposes of the FDCPA, which include eliminating abusive debt collection practices by debt collectors, ensuring that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and promoting consistent State action to protect consumers against debt collection abuses." 12 C.F.R. § 1006.1.

[3] *See Reichert*, 531 F.3d at 1005 (discussing the FDCPA's narrow exception to strict liability for bona fide errors); 15 U.S.C. § 1692k(c) ("A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.").

pursuant to the lease agreement. Aiello and Johnston dispute those arguments. They also contend that the lease termination clause is unconscionable and cannot be enforced. These arguments are each addressed below.

### A.      Debt Collector

Under the FDCPA, a "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

Aiello and Johnston argue that Rent Recovery is a debt collector as defined by the Act because its sole role in the events underlying this action was to recover rent that they disputed owing. Indeed, consistent with the implication its name invokes, Rent Recovery identified itself as a debt collector in two separate debt collection letters sent to Aiello. Rent Recovery argues that merely including a debt collector disclosure on a letter does not automatically trigger the FDCPA, but the cases it cites are distinguishable. *See Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 334 (4th Cir. 2012) (addressing whether the debt incurred was a consumer debt, not whether the defendant was a debt collector); *Champion v. Bank of Am., N.A.*, No. 5:13-CV-00272-BR, 2014 U.S. Dist. LEXIS 78, at *6 (E.D.N.C. Jan. 2, 2014) (relying on the FDCPA's "creditor" exception in finding the defendant did not fall within the FDCPA's jurisdiction); *Clay v. Countrywide Home Loans*, No. C/A 9:08-1369-MBS-BM, 2008 U.S. Dist. LEXIS 124413, at *3 (D.S.C. Dec. 19, 2008) (same).

Rent Recovery characterizes its debt collection efforts in this case as an isolated incident, but it is undisputed that it attempted to collect from two separate individuals on multiple occasions. Moreover, this action is not the only instance in which Rent Recovery's attempts to collect a debt have been litigated. *Beckler v. Rent Recovery Sols., LLC*, 83 F.4th 693, 694 (8th Cir. 2023) ("debt collector Rent Recovery Solutions ("RRS") called plaintiff to collect an alleged $900 debt to her former landlord."); *McGhee v. Rent Recovery Sols., LLC*, No. 1:17-CV-72-CC-JKL, 2018 WL 4850119, at *1 (N.D. Ga. July 6, 2018) (setting forth that "Rent Recovery is a debt collection agency that specializes in collecting apartment rents from former residents" and

8

detailing supporting evidentiary material on its business activity, employment practices, and scope of credit reporting), *report and recommendation adopted*, No. 1:17-CV-0072-CC-JKL, 2018 WL 10809250 (N.D. Ga. Sept. 21, 2018); *Beckler v. Rent Recovery Sols., LLC*, No. 21-CV-2680 (WMW/DTS), 2022 WL 17689842, at *1 (D. Minn. Dec. 15, 2022) ("Defendant Rent Recovery Solutions, LLC (RRS) is a debt collection agency that specializes in collecting debts allegedly owed to residential landlords."), *aff'd*, 83 F.4th 693 (8th Cir. 2023).

The Court will take judicial notice of these cases for the fact that Rent Recovery has sought to collect a debt on multiple occasions. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (court filings and other matters of public record are the proper subject of judicial notice); *Bryan v. City of Carlsbad*, 297 F. Supp. 3d 1107, 1115 (S.D. Cal. 2018) (courts may take judicial notice *sua sponte*); *Ratchford v. Watford Specialty Ins. Co.*, 659 F. Supp. 3d 1032, 1038 (D. Ariz. 2023) (same); *Callan v. New York Cmty. Bank*, 643 F. App'x 666, 667 (9th Cir. 2016) (same). Given the totality of this evidence, the Court rejects Rent Recovery's argument that it is not a debt collector within the meaning of the FDCPA.

### B. FDCPA Violation

As relevant to the claims asserted here, the FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. A non-exhaustive list of conduct prohibited under this provision includes falsely representing "the character, amount, or legal status of any debt," § 1692e(2); "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false," § 1692e(8); and using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." § 1692e(10). The Act also prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

FDCPA claims are assessed from the perspective of the "least sophisticated debtor,' that is, what would the least sophisticated debtor believe." *Barria v. Wells Fargo Bank, N.A.*, No. 2:15-CV-01413-KJM-AC, 2016 WL 474319, at *4 (E.D. Cal. Feb. 8, 2016) (citing *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1136 (N.D. Cal. 2013)). "If the least sophisticated

1  debtor would 'likely be misled' by a communication from a debt collector, the debt collector has
2  violated the Act." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007)
3  (quoting *Swanson v. S. Oregon Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1988)).

4        The parties dispute whether the lease was terminated such that Rent Recovery's attempts
5  to collect the debt would amount to FDCPA violations. Aiello and Johnston argue that
6  Kimberly's representation that they did not owe anything on the lease constitutes a waiver of any
7  amount sought to be collected. Rent Recovery contends that, at best, Kimberly simply confirmed
8  that Aiello and Johnston had prepaid rent, but there was no conduct demonstrating an intent to
9  waive any lease obligations.

10       "To establish waiver under generally applicable contract law, the party opposing
11 enforcement of a contractual agreement must prove by clear and convincing evidence that the
12 waiving party knew of the contractual right and intentionally relinquished or abandoned it."
13 *Quach v. California Com. Club, Inc.*, 16 Cal. 5th 562, 584 (2024) (citing *Lynch v. California*
14 *Coastal Com.,* 3 Cal. 5th 470, 475 (2017)). Whether waiver has occurred depends on intent,
15 which "may be express, based on the waiving party's words, or implied, based on conduct that is
16 'so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right
17 has been relinquished.'" *Lynch*, 3 Cal. 5th at 475 (quoting *Savaglio v. Wal-Mart Stores, Inc.*, 149
18 Cal. App. 4th 588, 598 (2007)). "Waiver is ordinarily a question for the trier of fact" unless
19 "there are no disputed facts and only one reasonable inference may be drawn." *DuBeck v.*
20 *California Physicians' Serv.*, 234 Cal. App. 4th 1254, 1265 (2015).

21       Here, the terms of the lease provide that "THESE POLICIES MAY BE AMENDED OR
22 ADDED TO AT ANY TIME, UPON WRITTEN THIRTY (30) DAY NOTICE BEFORE THE
23 PROPOSED EFFECTIVE DATE OF THE CHANGE." Doc. 37-4 at 25. However,
24 "notwithstanding a provision in a written agreement that precludes oral modification, the parties
25 may, by their words or conduct, waive contractual rights." *Wind Dancer Prod. Grp. v. Walt*
26 *Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017). As set forth above, it is disputed whether
27 Kimberly assured Aiello and Johnston that they would not have to pay any sort of fees for
28 vacating early and whether she verbally communicated that they had paid rent through the end of

the lease. Any agreement or understanding that may have been reached regarding the reason for leaving the move-out date on the notice of intent to vacate form blank is also in dispute. *See Nicholson v. Thrifty Payless, Inc.*, No. C12-1121RSL, 2014 WL 618775, at *6 (W.D. Wash. Feb. 18, 2014) ("What Thrifty intended when it repeatedly agreed to extend construction deadlines without going through a formal modification process is for the jury to decide."). In sum, the evidence presented does not foreclose a trier of fact from drawing more than one reasonable inference such that intent may be determined as a matter of law. The threshold issue of waiver is therefore appropriately within the province of the jury.

### C. **Unconscionability**

Under California law, if a contract or a clause of the contract was unconscionable at the time it was made, a court "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). Unconscionability has both procedural and substantive elements, "the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)) (internal quotation marks omitted). These elements must both be shown to establish the unconscionability defense, but they need not be present in the same degree—they are weighed on a sliding scale, which allows a lesser finding of procedural unconscionability when there is significant substantive unconscionability present, and vice versa. *Armendariz*, 24 Cal. 4th at 114.

A procedural unconscionability analysis first considers whether the contract is one of adhesion. *OTO, LLC v. Kho*, 8 Cal. 5th 111, 126 (2019). Contracts of adhesion are "standardized[,] . . . imposed and drafted by the party of superior bargaining strength, relegat[ing] to the subscribing party only the opportunity to adhere to the contract or reject it." *Armendariz*, 24 Cal. 4th at 113. A procedural unconscionability analysis also asks whether there was oppression or surprise during formation such that closer scrutiny of a contract's fairness is required. *OTO, LLC*, 8 Cal. 5th at 126. "Oppression occurs where a contract involves lack of

11

1   negotiation and meaningful choice, surprise where the allegedly unconscionable provision is
2   hidden within a prolix printed form." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US),*
3   *LLC*, 55 Cal. 4th 223, 247 (citations and internal quotation marks omitted).
4           "Substantive unconscionability pertains to the fairness of an agreement's actual terms and
5   to assessments of whether they are overly harsh or one-sided." *Id.* at 246 (citing *Armendariz*, 24
6   Cal. 4th at 114). "A contract term is not substantively unconscionable when it merely gives one
7   side a greater benefit; rather, the term must be so one-sided as to shock the conscience." *Id.*
8   (citations and internal quotation marks omitted).
9           Procedurally, the lease termination option is modestly unconscionable. Although
10  California courts have recognized that tenants may generally find themselves in an inferior
11  bargaining position with respect to lease or rental agreements, *Harris v. Univ. Vill. Thousand*
12  *Oaks, CCRC, LLC*, 49 Cal. App. 5th 847, 855, 263 Cal. Rptr. 3d 386, 392 (2020), the record
13  indicates that Aiello and Johnston negotiated by signing a longer lease in exchange for a monthly
14  rental concession. Thus, the lease agreement is unlike a classic take-it-or-leave-it contract of
15  adhesion. *See, e.g.*, *Armendariz*, 24 Cal. 4th at 114–15 (finding that an arbitration agreement
16  imposed as a condition of employment was adhesive). However, there is no evidence that Aiello
17  and Johnston had the opportunity to negotiate any other aspect of the lease, including the
18  termination option. Nonetheless, procedural unconscionability remains somewhat tempered
19  because the termination option contained a heading in bold typeface, *Morris v. Redwood Empire*
20  *Bancorp*, 128 Cal. App. 4th 1305, 1321 (2005) (clear heading may refute a claim of surprise), and
21  was separately initialed. *Woodside Homes of Cal., Inc. v. Superior Ct.*, 107 Cal. App. 4th 723,
22  729 (2003) (buyers necessarily made aware of provision's existence by initialing paragraph
23  separately). Therefore, any procedural unconscionability with respect to the lease as a whole is
24  minimal; and only slightly more so as to the lease termination clause.
25          Substantively, the lease termination option is unconscionable to the extent Rent Recovery
26  asserts that Aiello and Johnston were required to pay the lease termination fee *in addition to rent*
27  *until the end of the lease term*, regardless of the date of vacancy. Such a construction imposes an
28  exorbitant fee—requiring two additional months of rent on top of the remaining lease term—

without regard to the date of vacancy or whether the unit is relet, resulting in a windfall to the landlord untethered to any actual loss. The provision, construed in this way, is one-sided and harsh, imposing an excessive financial burden on Aiello and Johnston without any consideration of their contractual counterparty's duty to mitigate damages, and shocks the conscience as required to establish substantive unconscionability.

Rent Recovery's reliance on *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305 (2005), for the proposition that termination fees such as the one here have been held not to be substantively unconscionable is entirely misplaced. The court in *Morris* explained that "[f]rom a value perspective, we are skeptical a one-time fee of $150 in exchange for affording a merchant the ability to accept customers' credit cards is so harsh or oppressive as to 'shock the conscience.'" *Id.* at 1324. There, the early termination fee was modest and reasonably related to the lender's administrative costs and not an impermissible penalty. *Id.* at 1315, 1323–24. Here, it is unclear whether the $3,154.00 termination fee on its own is proportional to the $373.45 turnover costs and potential risk of vacancy at The Emerson; but if coupled with rent obligations through the end of the lease regardless of the date Aiello and Johnston moved out, the termination option easily shocks the conscience and has a high degree of substantive unconscionability.[4]

Having found at least a minimal degree of procedural unconscionability and a high degree of substantive unconscionability in the lease termination option, the Court concludes that the

---

[4] Aiello and Johnston also argue in passing that the termination option is an unenforceable penalty, citing only to *Ebbert v. Mercantile Tr. Co. of California*, 213 Cal. 496, 499 (1931). To the extent they assert that the termination option is an unenforceable liquidated damages provision under California law, the argument is insufficiently briefed, as underscored by Rent Recovery's reply, which relies on the incorrect subsection of the applicable statute. "[A] liquidated damages provision in a residential lease is normally void, except where the parties specifically agree and 'when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.'" *Orozco v. Casimiro*, 121 Cal. App. 4th Supp. 7, 10–11 (Cal. App. Dep't Super. Ct. 2004) (quoting Cal. Civ. Code § 1671(d)); *see also Del Monte Props. & Invs., Inc. v. Dolan*, 26 Cal. App. 5th Supp. 20, 23 (Cal. App. Dep't Super. Ct. 2018) (noting the proponent of a liquidated damages provision in a residential lease bears the burden of proving its validity under Cal. Civ. Code § 1671). The record also appears to be underdeveloped as to the challenges in fixing actual damages and whether reasonable endeavors were made to approximate them. *See Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 322 (2011) (discussing considerations in evaluating liquidated damages provisions). At this stage, Aiello and Johnston have not sufficiently raised an argument for the Court to consider.

termination option, to the extent it requires payment of a termination fee in addition to rent through the full term of the lease, is unconscionable. *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1099 (9th Cir. 2024) (minimal procedural unconscionability and high substantive unconscionability sufficient under sliding scale approach).

Furthermore, any illegality in the unconscionable provision "is collateral to the main purpose of the contract"—here, granting Aiello and Johnston the right to use and occupy property for a specified period in exchange for rent—"and the illegal provision can be extirpated from the contract by means of severance . . . [making] such severance . . . appropriate." *Armendariz*, 24 Cal. 4th at 124. Accordingly, the unconscionable provision will be severed from the lease agreement to the extent set forth above. Cal. Civ. Code §§ 1599, 1670.5(a); *see also Serafin v. Balco Props. Ltd., LLC*, 235 Cal. App. 4th 165, 184 (2015) (decision to sever was within trial court's discretion when procedural unconscionability was minimal and agreement contained only one substantively unconscionable provision).

## IV. CONCLUSION

For the reasons explained above:

1. Rent Recovery's motion for summary judgment, Doc. 36, is denied; and
2. The lease termination option in Aiello and Johnston's lease agreement is severed as indicated in this Order.

IT IS SO ORDERED.

Dated:   July 11, 2025

_____
UNITED STATES DISTRICT JUDGE